# P O R T E R | S C O T T

A PROFESSIONAL CORPORATION
Martin N. Jensen, SBN 232231
350 University Avenue, Suite 200
Sacramento, California 95825
TEL: 916.929.1481
FAX: 916.927.3706
mjensen@porterscott.com

**TAYMAN LANE CHAVERRI LLP**
David Lee Tayman, MD Bar No. 15093
Katie Lane Chaverri, MD Bar No. 17074
1875 Eye Street, N.W., Fifth Floor
Washington, D.C.  20006
TEL: 202.695.8147
FAX: 202.478.2781
dtayman@tlclawfirm.com
kchaverri@tlclawfirm.com
*(Pro Hac Vice Application Pending)*

Attorneys for Plaintiff
J.A.B. – West Knoxville, Inc.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND

| | |
|---|---|
| J.A.B. – WEST KNOXVILLE, INC., | CASE NO. |
| Plaintiff, | **COMPLAINT FOR:** |
| | **DECLARATORY JUDGMENT AND** |
| v. | **BREACH OF CONTRACT** |
| JOS. A. BANK CLOTHIERS, INC., | |
| Defendant. | |
| _____/ | |

COMES NOW Plaintiff J.A.B. - West Knoxville, Inc. ("J.A.B. - West Knoxville" or the

"Franchisee"), as and for its Complaint Seeking Declaratory Judgment and for Breach of Contract

{01545570.DOCX}                                     1
                                          COMPLAINT

against Defendant Jos. A. Bank Clothiers, Inc. ("JABCO" or the "Franchisor"), and hereby states as follows:

## STATEMENT OF THE CASE

1.      This case demonstrates the adage that no good deed goes unpunished.  When the Franchisor was at a historical low point and struggling against a softening market and an overwhelming debt load, J.A.B. - West Knoxville's owners and affiliates (hereinafter referred to collectively as the "Bell Group") joined forces with JABCO.  The Bell Group's collaboration with JABCO provided key validation and expertise which allowed JABCO to revitalize and grow from an anemic 29 store chain in danger of failure to the dominant, national retailer of men's clothing and accessories that it is known as today.  In so doing, the Bell Group risked its own more than thirty-year reputation and history of success in men's clothing retailing.  Not only did the Bell Group help save JABCO by becoming its first franchisee, J.A.B. - West Knoxville's president, John W. Bell, III, worked directly for JABCO and with its Chairman and CEO to help expand and grow JABCO and lead it out of trouble by forging new franchisee relationships and developing new markets.  This resulted in new retail stores, which, in turn, resulted in many millions of dollars of additional revenue for JABCO.  The Bell Group entered into the franchise agreements and participated in the turnaround and subsequent growth of JABCO based on a fundamental promise: that the Bell Group and its affiliates would have an unlimited right to renew their franchise agreements, thereby alleviating the concern that JABCO could restrict the Bell Group's operation of its existing retail men's clothing business in the future.  However, when the time came to renew the franchise agreement, JABCO materially breached its promise by refusing to honor the renewal provisions of that agreement.

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL. 916.929.1481
FAX: 916.927.3706

{01545570.DOCX}

2.    J.A.B. - West Knoxville is entitled to a declaratory judgment declaring that it is entitled to purchase a replacement franchise with renewal rights consistent with the terms of the parties' existing agreement and the Franchisor's course of dealing.

3.    J.A.B. - West Knoxville is also entitled to damages against JABCO on account of the Franchisor's material breach of the terms of the parties' franchise agreement, both by failing to allow J.A.B. - West Knoxville to renew under the proper terms and by failing to properly follow the terms of those agreements during the course of the parties' operations.

## I.    PARTIES

4.    J.A.B. - West Knoxville, Inc. is a corporation incorporated under the laws of the state of North Carolina with its principal place of business in Asheville, North Carolina.

5.    Defendant Jos. A. Bank Clothiers, Inc. is a corporation incorporated under the laws of the state of Delaware with its principal place of business in Fremont, California.

6.    On or about June 18, 2014, JABCO merged into and with Men's Wearhouse, Inc., pursuant to Section 251(h) of the General Corporation Laws of the State of Delaware, with JABCO surviving as a wholly-owned subsidiary of the Men's Wearhouse, Inc.

7.    On or about January 31, 2016, Men's Wearhouse, Inc. effected a new holding company strategy pursuant to which Tailored Brands, Inc. replaced Men's Wearhouse, Inc.

## II.    JURISDICTION AND VENUE

8.    The amount in controversy in this civil action exceeds $75,000.00.  J.A.B. - West Knoxville and JABCO are citizens of different states and thus the matter in controversy in this civil action is between citizens of different States.  Accordingly, this Court has original jurisdiction over this civil action by virtue of the diversity of citizenship provisions of 28 U.S.C. § 1332.

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL. 916.929.1481
FAX: 916.927.3706

9.     The franchise agreement executed by and between J.A.B. - West Knoxville and JABCO provides that each of J.A.B. - West Knoxville and the Franchisor have agreed that "the state or federal court of general jurisdiction in which JABCO has its principal place of business at the time of the commencement of proceedings shall be the venue and exclusive forum in which to adjudicate any case or controversy arising from or relating to" such franchise agreement.  Thus, pursuant to the parties' agreement and 28 U.S.C. § 1391, venue is proper in the Northern District of California, which is the location of JABCO's principal place of business as of the commencement of this case.

## III.     FACTS COMMON TO ALL COUNTERCLAIMS

### A.     The Bell Family Builds a Successful, Independent Regional Retail Business.

10.     In 1929, John W. Bell founded a chain of general stores that served rural North Carolina and would eventually evolve into the Bell Group and J.A.B. West - Knoxville.  These general stores were successful and a key part of the communities in which they operated.  In 1957, the Bell family expanded its retail business into men's clothing and accessories.  The Bell family's business flourished and, by 1991, was a leading regional retail chain of men's clothing and accessories in the markets in which the stores operated.

### B.     JABCO Experiences Trouble and Needs To Turn Itself Around.

11.     Until 1986, Defendant JABCO,[1] was a men's clothing retailer owned by the international corporate conglomerate Quaker Oats Co.  In 1986, JABCO, which at that point had a catalog and 29 stores which collectively generated approximately $112 million in sales, was spun out of Quaker Oats Co. through a leveraged buyout which saddled JABCO with approximately

---

[1] This section is a discussion of the history of the "Jos. A. Bank" men's clothing business generally and is germane to an understanding of the context which led to JABCO promising to allow the Bell Group unlimited renewals of their franchise agreements for Jos. A. Bank-branded stores. Certain corporate non-material details are simplified and thus any and all references to JABCO herein include JABCO's predecessors-in-interest.

{01545570.DOCX}                                    4

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL. 916.929.1481
FAX: 916.927.3706

$96 million in debt. Although the leveraged buyout was predicated on the expectation of substantial growth which would have allowed JABCO to almost double in size, the planned-for growth never materialized. Following Quaker Oats' sale of JABCO, sales softened substantially, leading to a restructuring in 1989 and 1990, which, in turn, led to the replacement of most of JABCO's senior management, including its Chief Executive Officer (CEO).

12.    In 1990, JABCO hired Timothy Finley as its new CEO and Chairman of the Board and gave him the mandate to turn the company around and enhance its position in the national clothing and menswear marketplace. A key part of this turnaround strategy was to open additional stores. However, because of the company's massive debt load, JABCO lacked access to the funding necessary to drive corporate growth and JABCO's senior management struggled to raise capital for expansion and the creation of more stores.

13.    Because of this, JABCO's senior management decided that the creation of a system of franchise stores and the recruitment of potential franchise store operators (i.e., franchisees) would be the best possible strategy to turn JABCO around and put the company back on track to financial health and success.

14.    In 1991, JABCO's senior management concluded that the most logical recruitment avenue for potential franchisees would be to approach existing clothing and menswear retailers. JABCO's senior management thought that if they could convince successful clothing retailers that joining the JABCO franchise system was financially beneficial, those people would become JABCO franchisees.

15.    The question of whether or not to allow potential franchisees to have limited versus unlimited franchise renewals was a key issue of discussion among JABCO's executives while the company's business expansion strategy was being worked out. JABCO's senior management

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA 95825
TEL: 916.929.1481
FAX: 916.927.3706

analyzed this issue and concluded that asking existing clothing and menswear retailers to become JABCO franchisees without giving them unlimited renewal rights was not the proper strategy. JABCO's senior management reached this conclusion for two reasons:  Asking a potential franchisee with an existing business with an unlimited lifespan to convert that business into a JABCO franchise store of limited duration was unreasonable.  Also, at that time, like today, JABCO was not financially sound and JABCO's senior management realized that potential franchisees would not be willing to take a significant risk for themselves and their businesses, which had been family-owned and operated for generations, without the assurance of unlimited franchise renewals.

16.    JABCO's senior management decided that allowing potential franchisees the unlimited option to renew their franchise agreements would induce those potential franchisees to (a) convert their businesses to the "Jos. A. Bank" brand; (b) cease doing business with other manufacturers and/or distributors of men's clothing and accessories; and (c) focus their efforts on enhancing JABCO's position in the national clothing and menswear marketplace, thereby making JABCO more profitable.

17.    To that end, Jos. A. Bank's Chairman and CEO Mr. Finley made it clear to JABCO's attorneys and employees that asking potential franchisees to convert their existing stores to JABCO franchise stores without also offering and giving an unlimited right to renew the franchise or purchase successor franchises was a non-starter.

**C.    After Being Promised Unlimited Renewals, the Bell Group Decides to Recast Its Well-Established Clothing Retail Business as a JABCO Franchisee.**

18.    Shortly after he became Chairman and CEO of JABCO, Mr. Finley became acquainted with John W. Bell, III, the the chief executive of the Bell Group and its affiliates.  The Bell Group was an operator of men's clothing and accessory retail stores located in Asheville,

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

Durham, and Greensboro, North Carolina, Greenville, South Carolina, and Knoxville, Tennessee – all markets that JABCO wanted to enter.  Mr. Finley and Mr. Bell discussed the potential of the Bell Group joining JABCO and how this would strengthen both companies going forward.  After exploring several options on how to accomplish this partnership, Mr. Finley and Mr. Bell determined that a franchise arrangement with an unlimited right to renew or purchase successor franchises would be the best way to proceed.

19.    JABCO and the Bell Group began negotiating a franchise agreement in 1991. Early in the negotiations, the Bell Group made it very clear to JABCO that the Bell Group had no interest in converting their stores to JABCO franchise stores and investing the time, money, and effort over the years to build JABCO's brand in the marketplace if the Bell Group did not also receive the right to unlimited renewals.  "Unlimited renewals" did not and does not mean that a franchise store will be perpetually in existence.  Rather "unlimited renewals" meant and means that the term or duration of a franchise store's existence will be in the control of the franchisee and, as long as the franchisee satisfied its obligations under the relevant franchise agreement and was not grossly in default, the franchisor would not be able to limit the term or duration of a franchise store's existence without the agreement of the franchisee.

20.    In those negotiations, JABCO acknowledged that the Bell Group's position was reasonable and understandable and, therefore, JABCO agreed not to restrict the number of renewals that the franchisees would receive.  Instead, JABCO agreed that the franchisees would be entitled to renew on the same terms and renewal term as the then current form of the franchise agreement.

21.    Because of this renewal promise, JABCO's attorneys put the language "executes the then current form of Franchise Agreement" into the first generation of JABCO's franchise

agreements.  The Bell Group and JABCO subsequently agreed that the franchisor and franchisee would execute the form of franchise agreement which JABCO then customarily used, "or most recently used," in granting franchise rights for JABCO Stores.  The form of franchise agreement Franchisor customarily used, and most recently used, for granting franchise rights for JABCO Stores is the form of agreement that JABCO used to renew the Jackson, Mississippi, franchise.

22.    After the Bell Group and its historically successful retail clothing stores agreed to join JABCO's franchise network, the morale of JABCO's executive and operations staff improved substantially and JABCO experienced a reversal of the rapid exodus of employees that had previously departed JABCO.

**D.    The Bell Group's President, John W. Bell, III, Joins JABCO.**

23.    After Bell Group executed its first franchise agreement with JABCO, the Franchisor hired Mr. Bell as a corporate executive tasked with developing new franchise stores. JABCO's Chairman and CEO, Mr. Finley, specifically directed Mr. Bell to offer unlimited renewal rights to potential JABCO franchisees, meaning that so long as they satisfied their obligations under the franchise agreements and were not grossly in default, those franchisees would not have to worry about losing their business and investment and would instead be able to repeatedly renew, without limitations, their franchise agreement with JABCO.  This was one of the biggest concerns Mr. Bell had to overcome when trying to convince a potential franchisee to sign a franchise agreement with JABCO.

24.    In 1996, Mr. Bell again worked with JABCO, through an entity called Bell, French & Associates, Inc., to update the franchise agreement.[2]  In the Uniform Franchising Offering Circular that Mr. Bell was tasked with distributing to potential franchisees, Bell, French & Associates, Inc. was identified as JABCO's "Exclusive Franchise Broker."  Given his prior history

_____

[2] Bell, French & Associates, Inc. was partially owned by Mr. Bell but was otherwise a separate entity from, and not an affiliate of, the Bell Group.

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

of relations with potential franchisees as Director of Franchise Development and Real Estate, both Mr. Bell and JABCO understood that one of the main concerns of potential and current franchisees would be renewal rights.    In addition to the assurances provided to potential franchisees discussed above, JABCO sought to further alleviate this concern by adding language to the franchise agreement to clarify that the form of franchise agreement JABCO would use for renewing franchises would be the form "which Franchisor then customarily uses in granting renewal franchises for Jos. A. Bank stores."  This language was added so that a one-off franchise agreement would not change the then-current form of the franchise agreement and the updated franchise agreement would not be a less favorable form of agreement for JABCO's franchisees.

25.    On or about April 12, 2006, J.A.B. - West Knoxville entered into a franchise agreement with Franchisor relating to the opening and operation of a Jos. A. Bank-branded retail store located in Knoxville, Tennessee (the "West Knoxville Franchise Agreement").  The West Knoxville Franchise Agreement contained substantially identical renewal language -- "Franchisor and [J.A.B. - West Knoxville] will execute the form of franchise agreement . . . which Franchisor then customarily uses, or most recently used, in granting franchise rights for Jos. A. Bank Stores, ...."  See West Knoxville Franchise Agreement, § 16.03.

### E.    JABCO's Contractual Breaches and Attempts to Avoid Fulfilling Promises Relied on by J.A.B. - West Knoxville.

26.    Subsequent to entering into the West Knoxville Franchise Agreement, J.A.B. - West Knoxville has operated its business and its "Jos. A. Bank"-branded retail store under the West Knoxville Franchise Agreement at all times material hereto.

27.    The issue of whether affiliates of J.A.B. - West Knoxville which own and operate JABCO franchise stores are entitled to unlimited renewals has been the subject of a dispute since 2015.  On or about October 9, 2015, JABCO brought a civil action in the U.S. District Court for

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

the District of Maryland against three affiliates of J.A.B. - West Knoxville and the Bell Group seeking a declaration of the parties' rights. Those affiliates counterclaimed with their own declaratory judgment claim as well as claims for breach of contract and misrepresentation. Subsequently the misrepresentation claim was dismissed for lack of adequate particularity in pleading pursuant to Fed. R. Civ. P. 9(b). At the time the Maryland Action was filed, the U.S. District Court for the District of Maryland was the proper venue for such action. That is not the case for this civil action.

28.     On or about October 29, 2015, J.A.B. - West Knoxville sent JABCO a letter via U.S. Mail and electronic mail notifying JABCO that J.A.B. - West Knoxville intended to renew the West Knoxville Franchise Agreement pursuant to Section 16 of that franchise agreement. On or about December 22, 2015, the Bell Group received JABCO's response which included a form of franchise agreement similar to that used in 2011 for the "Jos. A. Bank"-branded franchise store located in Mandeville, Louisiana (the "Mandeville Form"). The Mandeville Form tendered by JABCO was not proper because it is not "the form of franchise agreement . . . which Franchisor then customarily uses, or most recently used, in granting franchise rights for Jos. A. Bank Stores."

29.     Importantly, by the mutual agreement of the parties, the Mandeville Form did not provide for unlimited renewals. As described in greater detail below, the Mandeville Form, by the mutual agreement of the parties, was a contract designed to be used in that single instance and the contract itself specifically disclaimed use of the Mandeville Form as the form for determining rights of franchise renewal or the terms on which a replacement franchise may be purchased.

30.     On or about January 4, 2016, J.A.B. - West Knoxville reminded JABCO that the Mandeville Form was not the proper form to be used in renewing the West Knoxville Franchise Agreement. On or about March 11, 2016, Franchisor's counsel sent J.A.B. - West Knoxville

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

(among others) a letter asserting that the West Knoxville Franchise Agreement will expire on April 30, 2016.

31.    Throughout most of 2015 leading up to the Maryland Action and the period since then, the parties have exchanged numerous letters and have had numerous telephone and in person discussions regarding this matter.  Throughout this extended dialog, JABCO has consistently insisted that the Bell Group and its affiliates, including J.A.B. - West Knoxville, agree to use the Mandeville Form, thereby failing and refusing to abide by the plain language terms of the franchise agreements between the parties, which would call for renewal to be based on the so-called "Jackson Form" (as defined and discussed below).

32.    The Mandeville Form, which was used only once on August 31, 2011 to grant franchise rights for Jos. A. Bank stores, sets out different franchisee rights than were conferred later by JABCO in the renewal of two other franchises located in Springfield, Illinois and Jackson, Mississippi in 2014.  The parties recognized when they negotiated the Mandeville Form that there would be subsequent grants of franchise rights (i.e., renewals) granted through a form or forms of agreement with different terms.  Thus, the 2011 Mandeville Form provides different rights and conditions, and includes a specific limitation on using those rights and conditions in subsequent grants of franchise rights.

33.    Accordingly, the franchise rights granted by the Mandeville Form are neither "the franchise rights customarily use[d] in granting successor franchises for Jos. A. Bank stores," nor are they the "most recently used" franchise rights granted by JABCO.  Under a plain language reading of the relevant agreements, the Mandeville Form should not be used to govern the franchise renewal rights granted to J.A.B. - West Knoxville.

34.    Moreover, as explained above, the Mandeville Form itself explicitly disclaims its

{01545570.DOCX}

use to grant successor or renewal franchise rights for JABCO stores:

> With respect to any other entity which may operate a Jos. A. Bank Store under a franchise agreement with Franchisor, <u>this Agreement [the Mandeville Franchise Agreement] is not intended to establish the Term that is customarily used by Franchisor in granting franchises or successor franchises for Jos. A. Bank Stores, nor is it the intent of Franchisor that the Term of this Agreement be used as the Term that Franchisor most recently used when establishing the Term of any future franchise or successor franchise for a Jos. A. Bank Store.</u> Similarly, the scope of any protected area or territorial exclusivity granted in connection with the purchase by any other entity of any future franchise or successor franchise for a Jos. A. Bank Store is not intended to be and shall not be limited or governed by this Agreement.

<u>See</u> Mandeville Form at § 2.05 (emphasis supplied).  As noted above, the Mandeville Form is by and between JABCO and J.A.B. - Mandeville, Inc., a corporation wholly-separate and distinct from J.A.B. - West Knoxville.

35.    In renewing the franchise rights of the Jackson, Mississippi franchisee in 2014, JABCO simply authorized the renewal using the existing form of franchise agreement without reissuing a new superseding written form.  This methodology for granting franchise rights for Jos. A. Bank stores, the "Jackson Form," was used not only with respect to the Jackson, Mississippi location but also with the franchise stores located in Asheville, North Carolina, Knoxville[3], Tennessee, and Springfield, Illinois.

36.    The Jackson Form was also used to grant successor rights to franchisees in Asheville, North Carolina on February 27, 2012 (five (5) months after the Mandeville Form was used).

/ / /

/ / /

/ / /

---

[3] This was for a different franchise store than the one operated by J.A.B. - West Knoxville and at issue in this civil action.

{01545570.DOCX}

12

COMPLAINT

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL. 916.929.1481
FAX. 916.927.3706

37.     The Jackson Form was also used to grant successor rights to franchisees in Knoxville, Tennessee on March 19, 2012 (six (6) months after the Mandeville Form was used).[4]

38.     The Jackson Form was also used to grant successor rights to franchisees in Springfield, Illinois on June 2, 2014 (almost three (3) years after the Mandeville Form was used).

39.     In fact, until JABCO's recent attempt to force J.A.B. - West Knoxville's affiliates to agree to renew using the improper Mandeville Form (the dispute which led to the Maryland Action), all prior franchise renewals and purchases of successor franchises were accomplished through the Jackson Form – that is, by simply authorizing the renewal using the existing form of franchise agreement without reissuing a new superseding written form.  Thus, the Jackson Form is both the form of "franchise rights customarily use[d] in granting successor franchises for Jos. A. Bank stores" and it is the "most recently used" form for granting successor franchises for JABCO stores.

40.     Notably, the Jackson Form was used to grant successor rights to franchisees in Jackson, Mississippi on October 24, 2014, more than three (3) years after the Mandeville Form was used.  Because of this timing, and because the Mandeville Form was only used once and specifically and explicitly disclaims its use to grant successor or renewal franchise rights, the Mandeville Form is not the form of franchise agreement which JABCO customarily uses, or most recently used, to grant franchise rights for Jos. A. Bank stores.  Thus, JABCO's tender of the Mandeville Form of agreement to J.A.B. - West Knoxville as the form under which JABCO would grant J.A.B. - West Knoxville successor or renewal franchise rights was improper and in violation of the terms of the West Knoxville Franchise Agreement.

---

[4] This was for a different franchise store than the one operated by J.A.B. - West Knoxville and at issue in this civil action.

COMPLAINT

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

41.    The Jackson Form is the form most recently used to grant franchise rights for JABCO stores and has been used numerous times subsequently to the Mandeville Form, which, by design, was only to be used once.

42.    This is important because of the specific provision for renewal found in the West Knoxville Franchise Agreement.  The West Knoxville Franchise Agreement provides that J.A.B. - West Knoxville may "buy a successor franchise for [their retail location] on the terms and conditions of Franchisor's then current form of franchise agreement[.]"   See West Knoxville Franchise Agreement at § 16.01.  The West Knoxville Franchise Agreement then goes on to clarify that if a franchisee, J.A.B. - West Knoxville, is entitled to purchase a successor franchise pursuant to § 16.01, Franchisor and the franchisee will execute franchise agreements "which Franchisor then customarily uses, or most recently used, in granting franchise rights for Jos. A. Bank stores[.]"  See West Knoxville Franchise Agreement at § 16.03 (emphasis supplied).

43.    In response to J.A.B. - West Knoxville's October 29, 2015 letter seeking to purchase a successor franchise, JABCO was required, by the terms of the Franchise Agreement, to allow the J.A.B. - West Knoxville to use the Jackson Form (which, each time it is used, allows for a 10-year term and a 10-year renewal) to renew the West Knoxville Franchise Agreement (or, in other words, to buy a successor franchise).  Notwithstanding the Bell Group's and J.A.B. - West Knoxville's efforts to convince the Franchisor to properly live up to its contractual obligations, the Franchisor has consistently failed and refused to do so.

44.    Moreover, the Franchisor appears to allege, through its March 11, 2016 letter, that because J.A.B. - West Knoxville was unwilling to accept the Franchisor's improper tender of a successor franchise agreement using the improper Mandeville Form, J.A.B. - West Knoxville no longer qualifies to buy a successor franchise agreement from JABCO.  The Franchisor cannot

deliver the wrong form of agreement in material breach of the West Knoxville Franchise Agreement and then claim that J.A.B. - West Knoxville has lost its right to purchase a successor franchise because it would not agree to sign the incorrect form.

## IV.    COUNT I:    DECLARATORY JUDGMENT

45.    J.A.B. - West Knoxville repeats and realleges the allegations set forth in paragraphs 1 through 44 above as if fully set forth in this Count I.

46.    An actual controversy exists between J.A.B. - West Knoxville, on the one hand, and JABCO, on the other hand, as to which form should be used to grant J.A.B. - West Knoxville successor franchise rights.

47.    J.A.B. - West Knoxville contends that the Jackson Form is the form customarily or most recently used pursuant to which the Franchisor has granted franchise rights for Jos. A. Bank franchisees and, therefore, pursuant to the terms of the West Knoxville Franchise Agreement, the Franchisor should use that form to grant successor franchise rights to the J.A.B. - West Knoxville.

48.    The Franchisor contends that, even though it has more recently used the Jackson Form, the Mandeville Form should govern the terms of any successor franchise rights granted by the Franchisor to J.A.B. - West Knoxville.

49.    J.A.B. - West Knoxville is entitled to a declaratory judgment that the Jackson Form is the most recently and customarily used form pursuant to which the Franchisor has granted franchisee rights for Jos. A. Bank stores and thus that the Franchisor should use that form to govern the successor franchise rights granted to J.A.B. - West Knoxville.

## V.    COUNT II:

## BREACH OF CONTRACT (FAILURE TO PROPERLY RENEW)

50.    J.A.B. - West Knoxville repeats and realleges the allegations set forth in paragraphs

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL. 916.929.1481
FAX: 916.927.3706

1 through 49 above as if fully set forth in this Count II.

51.    The West Knoxville Franchise Agreement provides that franchisees may buy a successor franchise for their retail location on the terms and conditions of Franchisor's then current form of franchise agreement.

52.    The West Knoxville Franchise Agreement then goes on to clarify that if a franchisee is entitled to purchase a successor franchise, Franchisor and the franchisee will execute franchise agreements "which Franchisor then customarily uses, or most recently used, in granting franchise rights for Jos. A. Bank stores[.]"

53.    The Jackson Form was the form most customarily used, or most recently used, by the Franchisor to grant franchise rights for Jos. A. Bank stores.  Pursuant to the Jackson Form, the franchisee was afforded the right to purchase an additional successor franchise at the end of its term, that is, unlimited renewals.

54.    Franchisor's failure and refusal to allow J.A.B. - West Knoxville to buy a successor franchise for its retail locations on the terms and conditions of the Jackson Form constitutes a material breach by Franchisor of its obligations under the West Knoxville Franchise Agreement.

55.    This material breach by Franchisor of its obligations under the West Knoxville Franchise Agreement has caused J.A.B. - West Knoxville to incur, and to continue to incur, substantial legal expenses and other damages in an amount to be determined at trial but in any event not less than $75,000.00.

56.    Franchisor's failure and refusal to allow J.A.B. - West Knoxville to buy a successor franchise for its retail locations on the terms and conditions of the Jackson Form denied J.A.B. - West Knoxville its right to purchase a successor franchise under the terms of the West Knoxville Franchise Agreement and constitutes a separate material breach by the Franchisor of the terms and

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

conditions of the West Knoxville Franchise Agreement.

57.    This second material breach has caused J.A.B. - West Knoxville to incur substantial damages in an amount equal to or in excess of the value of its retail businesses.  The amount of damages J.A.B. - West Knoxville is entitled to as a result of this second material breach by Franchisor shall be determined at trial in this matter but is in any event more than $8.1 million.[5]

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff J.A.B. - West Knoxville prays that the Court enter judgment as follows:

I.      On Count I, Declaratory Judgment, in favor of J.A.B. - West Knoxville and against JABCO declaring that (a) the Jackson Form is the most recently used form pursuant to which JABCO has granted franchisee rights for JABCO franchise stores; and (b) JABCO should use the Jackson Form to govern the successor franchise rights granted to J.A.B. - West Knoxville;

II.     On Count II, Breach of Contract (Failure to Properly Renew), in favor of J.A.B. - West Knoxville and against JABCO (a) in an amount not less than $75,000.00, which amount constitutes the amount of damages equal suffered by J.A.B. - West Knoxville as a result of the material breaches of the failure and refusal of the Franchisor to properly renew J.A.B. - West Knoxville's franchise rights; or, in the alternative; (b) if this Court finds that the Franchisor's failure and refusal to allow J.A.B. - West Knoxville to buy a successor franchise on the terms and conditions of the Jackson Form caused J.A.B. - West Knoxville to no longer be eligible to purchase a successor franchise under the terms of the West Knoxville Franchise Agreement, in an amount more than $8.1 million which amount constitutes the amount of actual damages equal

---

[5] This damages calculation following the same methodology used to value Jos. A. Bank when Men's Wearhouse merged with Jos. A. Bank in 2014.

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL. 916.929.1481
FAX: 916.927.3706

to the value of J.A.B. - West Knoxville's retail businesses before any additional

damages J.A.B. - West Knoxville may be entitled to;

III.    Awarding J.A.B. - West Knoxville its fees and costs associated with this matter,

including, without limitation, reasonable attorneys' fees; and

IV.    Granting such other and further relief as the Court deems just and proper.

Dated:  April 29, 2016                     PORTER SCOTT
                                           PROFESSIONAL CORPORATION


                                           By:    /s/ Martin N. Jensen
                                                  Martin N. Jensen
                                                  Attorneys for Defendants

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

{01545570.DOCX}                          18
                               COMPLAINT